UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES JOHNSON,

        Plaintiff,                            CIVIL ACTION NO. 08-CV-13551

      vs.                                      DISTRICT JUDGE JOHN FEIKENS

COMMISSIONER OF                    MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

        Defendant.

_____/

**REPORT AND RECOMMENDATION**

**I.    RECOMMENDATION:**    This Court recommends that Plaintiff's Motion for Summary Judgment (Docket no.9) be DENIED, that of Defendant (Docket no. 14) DENIED, and that the case be REMANDED for further proceedings consistent with this Report.

                                                      \*\*\*

**II.    PROCEDURAL BACKGROUND**

Plaintiff filed an application for Supplemental Security Income (SSI) with a protective filing date of October 17, 2005 alleging disability as of May 24, 2000 as a result of ulcerated colitis, lower back pain and ankylosing spondylitis[1]. (TR 37-41, 46, 66). The Social Security Administration denied benefits. (TR 33-36). A requested *de novo* hearing was held by video on January 23, 2008 before Administrative Law Judge (ALJ) S.N. Willett. (TR 22). The ALJ subsequently found that the claimant was not under a disability or entitled to Supplemental Security Income because he was not under a disability at any time since October 17, 2005. (TR 22). The Appeals Council declined

---

[1] Plaintiff has prior claims for disability including a claim initially denied on February 24, 2005 and two claims denied by the appeals council on August 8, 2003. (TR 43).

to review the ALJ's decision and Plaintiff commenced the instant action for judicial review. (TR 3-5). The parties filed Motions for Summary Judgment. The issue Plaintiff raises for review is whether the ALJ's decision is supported by substantial evidence.

### III. PLAINTIFF'S TESTIMONY, MEDICAL EVIDENCE AND VOCATIONAL EXPERT TESTIMONY

#### A. Plaintiff's Testimony and Reports

Plaintiff was 38 years old at the time of the administrative hearing. (TR 293). Plaintiff has a high school education and past work experience as a fast food worker, a warehouse worker and an assembler. (TR 294). Plaintiff stopped working on December 28, 1999 when his seasonal job ended. (TR 66). Plaintiff reported that he "was not having any symptoms of [his] conditions at the time" and he was "a healthy person." (TR 66).

Plaintiff testified that he suffers from spondylopathy, arthritis in his shoulders, back and spine and tendonitis in his shoulders (predominately in the right). (TR 296). He testified that when it is cold, the arthritis in his joints and shoulders causes severe pain and he cannot "do too much walking, lifting, riding, or anything." (TR 297, 299). The spinal arthritis results in great pain for which he lies down approximately six to eight hours a day. He takes 800 mg. of Ibuprofen for pain three to four times a day. (TR 297). He also takes Tylenol (over the counter) and Bayer 525 mg. (TR 297). Plaintiff testified that he treated at the Rheumatology Center once per month but has not been there "in a while" because he needs a referral from his doctor. (TR 298).

Plaintiff testified that he also suffers from ulcerative colitis with flare-ups two to three times per year lasting from three days to one week. (TR 299). Flare-up cause him to be sick to his stomach or may result in his being hospitalized with abdominal pain and unable to eat or drink. (TR 296). Plaintiff testified that he is examined by his gastroenterologist about once every three months

and has blood work done to monitor his medications. (TR 298). He takes Sulfasalazine 500 mg., folic acid 1 mg. and hydrocortisone for his ulcerative colitis, Atenol for high blood pressure, Prevacid for acid reflux, and Prednisone when he has a flare-up. (TR 305-06). Plaintiff reported that side effects from his medications include drowsiness, constipation and nausea. (TR 299). Plaintiff testified that he does not like to take narcotic pain medications because they make him sleepy or sick. (TR 300).

Plaintiff lives in a house with his mother and a handicapped sister. (TR 300). He watches television and attends church once a week. (TR 301). Plaintiff testified that he does not do chores around the house because his mother will not let him. (TR 302). He goes to the store two to three times a week to do light shopping for his mother, but his mother does the grocery shopping. (TR 302). Plaintiff sleeps about three and a half hours per night and naps during the day about four times per week for twenty to thirty minutes each time. (TR 302).

Plaintiff testified that he can stand for fifteen to twenty minutes at a time, sit for thirty minutes at a time, the heaviest weight he can lift is a gallon of milk and he can comfortably frequently carry less than ten pounds. (TR 304). Upon further questioning, Plaintiff testified that during an eight-hour day, he could walk and stand for a total of five to six hours if the job allowed sitting and taking a break. (TR 308). He could perform a "walking job" for a total of five to six hours if he could sit down and take a break every fifteen minutes to a half-hour. (TR 309). Plaintiff testified that he could sit for a total of three to four hours. (TR 309). He testified that pushing puts pressure on his shoulders and hands and pulling puts pressure on his knees and back. (TR 304). He can climb stairs if there are handrails and he cannot crouch, stoop or squat. (TR 304).

**B.     Medical Evidence**

Plaintiff treated with Medley A. Larkin, D.O., and nurse Jeanne Bender, R.N., CS-FNP, from October 2003 through July 2005. (TR 80-84, 190, 202, 205-222, 266). Plaintiff was diagnosed with ulcerative colitis in approximately 2002 and iron deficiency anemia. (TR 80). An October 2003 esophagogastroduodenoscopy was normal and a colonoscopy revealed inflammatory bowel disease, ulcerative colitis, and pseudopolyps "probably burnt out colitis right colon." (TR 81, 219). A February 9, 2004 flexible sigmoidoscopy revealed significant inflammation involving the sigmoid colon and pseudopolyp formation with ulcerations which appeared to be superficial. (TR 83). In December 2004 Plaintiff was taking Azulfidine 500 mg. two tablets four times per day, Folic Acid, Ferrous Sulfate and Imuran 50 mg. (TR 80).

In March 2005 Plaintiff was evaluated by Bernard Noveloso, M.D., for complaints of low back and neck pain. (TR 271). Dr. Noveloso prescribed Motrin 800 mg and ordered x-rays. (TR 271). X-rays from March and August 2005 of Plaintiff's cervical spine, lumbar spine and right shoulder were normal. (TR 167, 171-72, 267-69, 272-74). On April 4, 2004 Dr. Noveloso noted the possibility that the inflammatory condition contributing to Plaintiff's ulcerative colitis was also affecting his joints. (TR 267). The doctor referred Plaintiff to a rheumatologist. (TR 267).

The record shows that Plaintiff treated with Albert Manlapit, M.D., rheumatologist, from April 2005 to December 2005. (TR 85-106, 244-52). Dr. Manlapit concluded that Plaintiff "has features of sero-negative spondyloarthropathy with axial more than peripheral joint involvement." (TR 85). The doctor noted that Plaintiff had agree to proceed with a trial of TNF Alpha Blocker therapy using a Remicade infusion but Plaintiff was notified that his insurance would not cover the treatment. (TR 85-86, 88). The doctor noted that Plaintiff had not contacted his case worker to

assist with the situation. (TR 86). Dr. Manlapit reported that Plaintiff's "right rotator cuff tendonopathy is more bothersome" and that Plaintiff had undergone a subacromial glucocorticoid injection. (TR 86).

In 2005 and 2006 Plaintiff treated with family physician Stacie L. Griemsman, M.D. (TR 225-32, 237-43, 258-63). On March 24, 2006 Dr. Griemsman completed a state agency Medical Examination Report and noted Plaintiff's diagnoses as ankylosing spondylitis, ulcerative colitis, hypertension and anemia. (TR 242). She noted that Plaintiff has ongoing problems with these conditions. She concluded that his status was "stable" and she did not note any physical or mental limitations. (TR 243). She reported that Plaintiff has full range of motion but has soreness with bending and shoulder motion. (TR 242). He also has full range of motion in the neck with stiffness. (TR 242).

In July 2005 Plaintiff reported to the emergency room complaining of abdominal pain. (TR 191). CTs of the abdomen and pelvis and a colonoscopy were unremarkable. (TR 191). An upper pan endoscopy revealed a 5 cm hiatal hernia sac with cameron erosions. (TR 192). Plaintiff was diagnosed with abdominal pain and bloating. (TR 191).

Plaintiff reported to the emergency room several times through late January 2006 to early February 2006 with complaints of abdominal pain and associated symptoms. (TR 122-66, 173-82). On January 22, 2006 Plaintiff reported to emergency care with complaints of abdominal pain. (TR 164). Plaintiff was discharged on January 23, 2006 with a diagnosis of acute abdominal pain and "diarrhea likely secondary from constipation." (TR 165). The same day, Plaintiff reported to the emergency room with complaints of lower abdominal pain and nausea. (TR 159). Plaintiff was diagnosed with a "likely flare of his ulcerative colitis" and discharged the following day. (TR 160).

On January 28, 2006 Plaintiff reported to the emergency room with complaints of abdominal pain and rectal bleeding which had started over the prior week. (TR 134). Plaintiff was diagnosed with "rectal bleeding secondary to exacerbation of ulcerative colitis," anemia secondary to rectal bleeding, and a "cardiac catheterization negative for coronary artery disease." (TR 139). It was noted that Plaintiff had a history of hypertension, ankylosing spondylitis and ulcerative colitis. (TR 139). Plaintiff was discharged on February 1, 2006. (TR 139). On February 6, 2006 Plaintiff reported to the emergency room with complaints of chest pain. (TR 122, 173-77). Chest x-rays were negative. (TR 128). The treating physician diagnosed Plaintiff with acute pericarditis/myocarditis. (TR 131). Plaintiff was discharged on February 8, 2006. (TR 131).

In 2006 Plaintiff treated with Shawn Ingles, D.O., gastroenterologist, for his ulcerative colitis. (TR 108-120). In March 2006 Plaintiff underwent a colonoscopy to terminal ileum with biopsies. (TR 114). The surgery revealed "pancolitis with multiple pseudopolyps scattered throughout the colon." (TR 114). On March 30, 2006 Dr. Ingles noted that Plaintiff reported that he felt that his ulcerative colitis was "controlled" with the present regiment. (TR 108). Plaintiff was taking Atenolo, Azulfadine, folic acid, Ranitidine, Tramadol and Zantac. (TR 108). Dr. Ingles reported that he wanted to try Plaintiff on Ramicade and noted that Plaintiff could no longer use Imuran due to pericarditis. (TR 108).

In March 2006 Jill M. Butryn, M.D., a state agency medical consultant, completed a Physical Residual Functional Capacity Assessment and concluded that Plaintiff can occasionally lift twenty pounds and frequently lift ten pounds, stand and/or walk about six hours and sit about six hours of an eight-hour workday, and is limited in pushing and/or pulling with the upper extremities. (TR 280-89). Plaintiff is restricted to occasional climbing of ramps or stairs, never climbing ladders,

ropes or scaffolds, occasional stooping, kneeling, crouching and crawling, and may engage in frequent balancing. (TR 282). He is limited in reaching in all directions including overhead, but is unlimited in handling, fingering, and feeling. (TR 283). Dr. Butryn noted that Plaintiff had "developed multiple joint pain suspicious for enteropathic sero-negative spondyloarthropathy" and had symptoms of right rotator cuff tendonitis although there was no imaging in the file. (TR 281). Dr. Butryn noted that Plaintiff is able to care for his personal needs without difficulty, noted Plaintiff's statements regarding his limitations and difficulties and concluded that his allegations were partially credible. (TR 285).

      **C.**    **Vocational Expert**

The Vocational Expert (VE) classified Plaintiff's prior work as a crew person in the fast food environment as light exertion and unskilled, stock picker in a warehouse environment as medium exertion and unskilled, automobile parts assembler work as medium to heavy exertion and unskilled, and convenience store clerk as light exertion and overnight stock work as medium to heavy exertion and unskilled. (TR 295-96, 307).

The ALJ asked the VE to consider Plaintiff's testimony that he can stand for fifteen to twenty minutes at a time, sit thirty minutes before he has to get up and move around, lift a gallon of milk, carry less than ten pounds, needs to avoid pushing and pulling, needs handrails on both sides of the stairs to climb stairs and should avoid crouching, stooping and squatting. (TR 308). The VE testified that Plaintiff would not be able to perform his past relevant work. (TR 308). The ALJ asked whether there is other work that such an individual could perform if the individual had Plaintiff's age, education and vocational history and could stand for thirty minutes at a time, walk or stand for a total of five or six hours in an eight hour day with breaks every fifteen minutes to half-

hour and sit for a total of three to four hours. (TR 308-09). The VE clarified that this was work which allowed for a sit/stand option and testified that the available jobs with a sit/stand option would include unskilled office helper (5,000 jobs in Michigan, 176,000 in the United States), telemarketer (5,500 jobs in Michigan, 300,000 jobs nationally) and production worker (14,000 jobs in Michigan and 370,000 nationally). (TR 309-10).

The ALJ then asked the VE to consider an individual with Plaintiff's age, education and vocational experience who can lift twenty pounds occasionally, ten pounds frequently, "stand and walk about six hours in an eight-hour day, stand (sic) about six hours out of an eight-hour day," is limited in pushing and pulling with the upper extremities, is restricted to climbing ramps and stairs occasionally, can never climb ladders, ropes and scaffolds and is restricted to occasional stooping, kneeling, crouching and crawling. (TR 310). The VE testified that such an individual could perform Plaintiff's past relevant work as a fast food crew worker including cashier work but could not perform Plaintiff's other past relevant work. (TR 310). The VE testified that such an individual could perform the prior listed jobs with the sit/stand option by sitting all day and the jobs would include telemarketer (5,500 jobs in Michigan, 300,000 nationally), office helper (reduced to sedentary for just under 2,000 jobs in Michigan and 64,000 nationally) and production worker (2,300 in Michigan and "a little over 60,000" nationally). (TR 311).

## IV.   ADMINISTRATIVE LAW JUDGE'S DETERMINATION:

The ALJ found that although Plaintiff had not engaged in substantial gainful activity since the October 17, 2005 application date and suffered from ulcerative colitis, bilateral shoulder pain, ankylosing spondylosis and osteoarthrosis, all severe impairments, he did not have an impairment or combination of impairments that met or equaled the Listing of Impairments. (TR 17). The ALJ

found Plaintiff's statements concerning his symptoms were not entirely credible and although he is unable to perform his past relevant work, he has the ability to perform light work. The ALJ concluded that Plaintiff is capable of performing jobs that exist in significant numbers in the economy. (TR 17, 21). Therefore he was not suffering from a disability under the Social Security Act. (TR 22).

## V.   ANALYSIS:

### A.   Standard of Review:

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial

evidence also supports the opposite conclusion. *See Her v. Commissioner*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

**B.    Analysis**

*1.    Scope of the Court's Review*

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1)    he was not presently engaged in substantial gainful employment; and

(2)    he suffered from a severe impairment; and

(3)    the impairment met or was medically equal to a "listed impairment;" or

(4)    he did not have the residual functional capacity to perform his relevant past work.

*See* 20 C.F.R. § 416.920(a)-(f). If Plaintiff's impairments prevented him from doing his past work, the Commissioner, at step five, would consider his residual functional capacity ("RFC"), age, education and past work experience to determine if he could perform other work. If he could not, he would be deemed disabled. *See* 20 C.F.R. § 416.920(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualification to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

Plaintiff argues that the ALJ erred at step five in relying on testimony by the VE based on a hypothetical question that did not include the limitations of the ALJ's RFC and that the ALJ did

10

not comply with SSR 00-4p.  (Docket no. 21 at 10).  Plaintiff raises no other issues for review.

## *2.      Whether The ALJ's Findings at Step Five Are Supported By Substantial Evidence*

Plaintiff argues that the ALJ failed to meet his burden at step five to show that there is other work in the economy that Plaintiff can perform.  Plaintiff alleges that the ALJ relied on the VE's testimony at the hearing to find that there are a number of jobs which Plaintiff can perform yet neither of the ALJ's hypothetical questions to the VE contained the ALJ's RFC findings and limitations. Therefore, Plaintiff argues, the ALJ improperly relied on the VE's testimony at step five in determining that there are other jobs which the Plaintiff can perform.

The Commissioner bears the burden at step five of a disability determination to show that there is work available in the economy that the Plaintiff can perform.  The substantial evidence to support such a finding may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'"  *Varley*, 820 F.2d at 779 (citations omitted).  In a hypothetical question posed to the VE, an ALJ is required to incorporate only those limitations which he finds credible and supported by the record.  *See Casey v. Sec'y of Health and Human Servs.,* 987 F.2d 1230, 1235 (6th Cir. 1993).

In claims at the administrative law judge hearing level, "the administrative law judge . . . is responsible for assessing [the claimant's] residual functional capacity."  20 C.F.R. § 416.946(c). The ALJ found that "the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b)."  (TR 17).  The ALJ then went on to recite the definitions of both "light" work and "sedentary" work, and while the recitation of both may be superfluous, it appears

11

that the ALJ found that Plaintiff can perform "light work" without further limitations[2]. The Regulations provide that "[i]f someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967(b).

At first blush, the ALJ's finding that Plaintiff can perform "light work as defined in 20 C.F.R. § 416.967(b)" appears to be clear and simple. The remainder of the opinion, however, contains statements inconsistent with this finding and it is not clear whether Plaintiff has non-exertional limitations or not. For example, despite the statement that Plaintiff can perform "light" work, the ALJ makes a step four finding that Plaintiff is "unable to perform any past relevant work (20 C.F.R. 416.965)," despite Plaintiff's past work as a crew person in a fast food restaurant being classified as "unskilled work at the light level of exertion." (TR 21).

The ALJ also makes a statement that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills." (TR 21). In the same decision the ALJ later references section 204.00 in the Medical-Vocational Guidelines and states that "[i]f the claimant has solely non-exertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decision-making." (TR 21). Section 204.00 of the Guidelines relates to the ability to perform heavy work or very heavy work and it is unclear why that section is referenced in this decision. *See* Medical Vocational Guidelines, 20

---

[2] "Light work" is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b). A job may be in this category even though the weight lifted is very little if the job requires a "good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.*

12

C.F.R. Part 404, Subpart P, Appendix 2, section 204.00. (TR 21).

In the next paragraph of the ALJ's decision, the ALJ correctly stated that "'[i]f the claimant had the residual functional capacity to perform the full range of light work, Medical-Vocational Rule 202.21 would direct a finding of 'not disabled'. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded *by additional limitations*." (TR 22) (emphasis added). There is no indication what these additional limitations are and they are not set forth in a clear RFC within the ALJ's decision.

The Court declines to adopt either parties' speculative arguments as to which set of limitations in the record transcript the ALJ refers when he states in his decision that he "asked the vocational expert whether jobs exist in the national economy for an individual with claimant's age, education, work experience, and residual functional capacity." (TR 22). The ALJ referenced more than one set of limitations in his questions to the VE and it is not clear which of these limitations, if any, the ALJ ultimately adopted. Similarly, although the ALJ discusses the state agency consultants RFC assessment in his decision, he did not clearly adopt it. (TR 20-21). Without knowing whether the ALJ found that Plaintiff had non-exertional limitations and what those specific limitations are, the Court cannot determine whether the hypothetical question posed to the VE was necessary, accurate and/or constituted substantial evidence to support the ALJ's findings at step five.

The Court finds that the ALJ's decision at step four and step five is not supported by substantial evidence and the Court should remand this case so the ALJ can make a specific finding of Plaintiff's RFC. The ALJ should proceed to step four and determine whether Plaintiff can perform his past relevant work. The ALJ should then proceed to a step five determination if necessary. If the ALJ reaches a step five determination on remand, the hypothetical question to the

13

VE must incorporate the limitations the ALJ accepts as credible and supported by the record. *See Casey v. Sec'y of Health and Human Serv.,* 987 F.2d 1230, 1235 (6th Cir. 1993).

### 3.     *Whether The ALJ Complied With SSR 00-4p*

Plaintiff also argues that the ALJ failed to follow SSR 00-4p which requires an ALJ to determine whether the VE's testimony conforms to the Dictionary of Occupational Titles (DOT). Plaintiff points out that the ALJ's hypothetical question included the need for a sit/stand option, which is not addressed in the DOT. Plaintiff argues that SSR 00-4p requires that the case be remanded to resolve this conflict between the VE's testimony and the DOT. SSR 00-4p provides that before an ALJ may rely upon a VE's testimony, the ALJ must address any apparent unresolved conflicts between the jobs identified by the VE and the DOT's classification of those jobs. SSR 00-4p places an affirmative duty upon an ALJ to: (1) ask the VE whether any conflicts exist between the expert's testimony and the DOT, (2) "elicit a reasonable explanation" for any such conflict, and (3) explain the resolution of the conflict. SSR 00-4p.

The ALJ stated in his decision that "[p]ursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." (TR 22). There is no evidence in the transcript that the ALJ asked the VE whether her testimony was consistent with the DOT. Her testimony was in response to hypothetical questions which included non-exertional limitations, such as the need for a sit/stand option. Therefore, the matter should be remanded so the ALJ can determine whether there is a conflict between the VE's testimony and the DOT and address the issue in compliance with SSR 00-4p. The Court finds that the record requires further development and a remand is required so that the Commissioner can, if necessary, conduct a new step five inquiry and apply SSR 00-4p.

## **VI.** **CONCLUSION:**

The Commissioner's decision is not supported by substantial evidence. The Defendant's Motion for Summary Judgement (docket no. 14) should be denied, Plaintiff's Motion for Summary Judgment (docket no. 9) should be denied, and the case remanded for further proceedings.

**REVIEW OF REPORT AND RECOMMENDATION:**

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: August 28, 2009   s/ Mona K. Majzoub
MONA K. MAJZOUB
UNITED STATES MAGISTRATE JUDGE

## PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: August 28, 2009   s/ Lisa C. Bartlett
Courtroom Deputy